IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ELIZABETH J. LAMANNA,                    )
                                         )
        Plaintiff,                       )
                                         )
        vs.                              )      Civil Action No. 07-733
                                         )
SPECIAL AGENTS MUTUAL BENEFITS           )
ASSOCIATION, d/b/a/ SAMBA GROUP          )
INSURANCE PLAN,                          )
                                         )
        Defendant.                       )

## MEMORANDUM OPINION

### I.   INTRODUCTION

According to the Complaint filed in this Court on May 30, 2007,

Plaintiff Elizabeth J. Lamanna was insured under a long-term

disability insurance plan ("the Plan") administered by Defendant

Special Agents Mutual Benefits Association ("SAMBA") while she was

employed by the Federal Bureau of Investigation ("FBI.")  When she

became disabled as a result of significant medical problems

beginning in 1996, Ms. Lamanna sought benefits from Defendant

through the Plan.  Plaintiff received long-term disability ("LTD")

benefits from 1996 through 2004, but SAMBA subsequently determined

that although she could not return to her former work with the FBI,

she was not completely disabled and her benefits were terminated as

of January 30, 2005.  Following review and appeal, SAMBA issued a

final denial letter on September 30, 2005.

Having exhausted her administrative appeals, Plaintiff filed suit in this Court pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking the full amount of benefits due under the Plan together with attorney's fees and costs as provided by ERISA.

Defendant's answer to the Complaint conceded that SAMBA is the Plan sponsor, named fiduciary and administrator of the Plan, and that at one time, Plaintiff received LTD benefits under the Plan. (Doc. No. 6 at 1-2.) However, Defendant argues the evidence shows that according to the terms of the Plan, Plaintiff was able to perform gainful work other than her own occupation; consequently, SAMBA justifiably terminated her LTD benefits. (Id. at 2.)

The parties were unable to resolve the matter amicably and advised the Court that they both believed summary judgment motions were appropriate, based on the extensive administrative record. The Court therefore ordered the parties to file cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, together with concise statements of fact and briefs in support their motions. (Order of Court, September 11, 2007, Doc. No. 12.) The parties having complied with the Order of Court, this matter is now ripe for decision.

After careful consideration and for the reasons set forth below, Plaintiff's motion for summary judgment (Doc. No. 21) is granted and Defendant's cross-motion (Doc. No. 18) is denied.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's claims pursuant to 29 U.S.C. § 1132(e)(1). Venue is appropriate in this district inasmuch as the Plan is administered and Defendant's alleged breaches of duty occurred in this district. 29 U.S.C. § 1132(e)(2).

## III. STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material were

3

admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-323; Sollon, id.; Fed.R.Civ.P. 56(e). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

A court addressing cross-motions for summary judgment considers each motion separately. Smith v. Prudential Ins. Co. of Am., 513 F. Supp.2d 448, 452 (E.D. Pa. 2007), *citing* Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 150 (3d Cir. 1993). A party's concessions made for purposes of its own summary judgment motion do not carry over into the court's consideration of the opposing party's motion. Coolspring Stone Supply, id.

4

## IV.  FACTUAL HISTORY[1]

We set out in considerable detail the factual history because in deciding a motion for summary judgment in an ERISA case where the plaintiff claims benefits were improperly denied, a reviewing court is generally limited to the facts known to the plan administrator at the time the decision was made.  Post v. Hartford Ins. Co., 501 F.3d 154, 168 (3d Cir. 2007).  Moreover, the inquiry as to whether and how far the abuse of discretion standard should be heightened is an extremely fact-intensive exercise and therefore, in order to make this determination, the court must have all the relevant facts set out.  Gibson v. Hartford Life & Accident Ins. Co., CA No. 06-3418, 2007 U.S. Dist. LEXIS 47337, *8 (E.D. Pa. June 27, 2007).

Elizabeth Lamanna was born, raised, and educated in Pittsburgh, Pennsylvania, where she received a law degree from Duquesne University in 1981.  After several years as an assistant district attorney in Pittsburgh, Plaintiff began working as a special agent for the FBI in January 1986.  As an FBI employee, she was eligible to elect long term disability insurance coverage through a policy offered by SAMBA[2] which in turn was insured by Fidelity Security Life

---

[1]  Unless otherwise stated, the facts in this section are undisputed.  References to the record have been omitted except where the parties disagree about a specific fact or the Court has quoted a document exactly.

[2]  Membership in the Plan, and in other benefit plans offered by SAMBA, is open to individuals who are active, full-time employees, or retirees from, any United States government agency, including the FBI, "whose mission involves or supports activities to enforce federal laws or to secure the homeland through surveillance, intelligence, counterintelligence and other non-military security activities

5

Insurance Company ("Fidelity.") At all times relevant to the events herein, Plaintiff was covered under the Plan.

According to a report to one of her physicians, Ms. Lamanna was in good health until July or August 1992 when she began to experience a flu-like illness with aches, pains, fever, sore throat, headaches, and profound fatigue. After a week or so, all the symptoms disappeared except for significant chronic fatigue, muscle achiness, and weakness. Ms. Lamanna consulted a physician who diagnosed her with hypothyroidism[3] and began treating her with thyroid replacement therapy. In October 1993, after she collapsed while jogging, she was admitted to a hospital in Greenwich, Connecticut, for heart palpitations. Doctors there concluded she had been mis-diagnosed and that treatment with thyroid replacement had actually resulted in hyperthyroidism.[4] In addition, they

conducted at home or abroad, and the U.S. Courts." (AR at PLN 1-2.)

[3] Hypothyroidism is a condition in which the thyroid gland fails to produce enough of certain hormones which control metabolism. Consequently, the body's normal rate of functioning slows, causing mental and physical sluggishness. Hypothyroidism may cause a variety of symptoms and may affect all body functions. See the medical encyclopedia entry at the National Institute of Medicine's on-line reference website, www.nlm.nih.gov/medlineplus (last visited March 3, 2008), "MedlinePlus." In this instance, as in all others where MedlinePlus or other on-line public sources are cited, the information does not appear in the administrative record but is provided to assist the reader. See Kosiba v. Merck & Co., 384 F.3d 58, 69 (3d Cir. 2004) (A court may use evidence outside the administrative record in order to better understand the medical issues involved.)

[4] Hyperthyroidism is a condition in which the thyroid gland produces excess amounts of the hormones which control the body's metabolism. See medical encyclopedia entry at MedlinePlus.

6

discovered she had a positive test result for Lyme disease[5] which Ms. Lamanna could have contracted from possible exposure to ticks during weapons field training required by the FBI.

In April 1994, Ms. Lamanna consulted with a rheumatologist, Dr. Richard L. Danehower. Dr. Danehower noted by that time, Ms. Lamanna had probably seen as many as fifteen other doctors in an effort to determine the source of her illness. Following a physical examination which he described as "essentially normal," the physician noted:

A search for tender points was essentially negative. Despite the absence of tender points, I think much of what she is describing is in the fibrositis[6] category. Whether

---

[5]  Lyme disease is an inflammatory disease spread through a tick bite and may be objectively diagnosed through blood tests. Early symptoms resemble the flu and include fever, headache, chills, muscle pain, and lethargy. Stiff neck, joint inflammation, body-wide itching, unusual behavior, and other symptoms may be seen in persons with later stages of the disease. It is treated with antibiotics and with anti-inflammatory medications such as ibuprofen to relieve joint stiffness. *See* medical encyclopedia entry at MedlinePlus.

[6]  Fibrositis is an alternative name for fibromyalgia, a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues; it has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety. Fibromyalgia can develop on its own or along with other musculoskeletal conditions such as rheumatoid arthritis or lupus. The disorder has an increased frequency among women 20 to 50 years old. [Ms. Lamanna was 37 years old in 1992.]

The cause of the disorder is unknown, but proposed etiologies include physical or emotional trauma; abnormal pain transmission responses; sleep disturbances; changes in skeletal muscle metabolism, possibly caused by decreased blood flow; and infectious microbes such as viruses (although at this time, no such virus or microbe has been identified.) The overwhelming characteristic of fibromyalgia is long-standing pain associated with 18 defined "tender points," which are distinct from "trigger points" seen in other pain syndromes. The soft-tissue pain of fibromyalgia is described as deep-aching, radiating, gnawing, shooting or burning, and ranges from mild to

7

this is idiopathic[7] fibrositis or whether this is post Lyme fibrositis I am not sure. Whether [intravenous] antibiotics would help her with this I do not know. My guess is that they would not, but of course if they did, that might offer for her the possibility of permanent cure, which is otherwise not something that I can offer her for idiopathic fibrositis.

(Administrative Record, Docket Nos. 15, 16, and 17, "AR," at 229.)

Plaintiff was also examined in May 1994 by an infectious disease specialist, Dr. Peter C. Welch, who ordered a number of blood tests to rule out Lyme disease. Dr. Welch concluded, "My impression is that she has fatigue and [joint pain], the exact cause of which is not clear. Possibilities include fibromyalgia [or] Lyme disease, with or without fibromyalgia...." (AR 225.)

In July 1994, Dr. Frank Pappalardo, Ms. Lamanna's general practitioner, recommended that she be examined at the Mayo Clinic in

---

severe. Fibromyalgia sufferers tend to wake up with body aches and stiffness. For some patients, pain improves during the day and increases again during the evening, although many patients with fibromyalgia have day-long, unrelenting pain. Pain can increase with activity, cold or damp weather, anxiety, and stress.

Specific symptoms include tender points on the back of the neck, shoulders, chest, ribcage, lower back, buttocks, thighs, knees, and elbows; fatigue; sleep disturbances; body aches; reduced exercise tolerance; and chronic facial muscle pain or aching. Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, as well as pain and tenderness in at least 11 of the 18 tender-point sites. Laboratory and x-ray tests may be done to confirm the diagnosis, primarily by ruling other conditions with similar symptoms. In mild cases, symptoms may go away when stress is decreased or lifestyle changes are implemented. Treatment may include medications to decrease depression, relax muscles, improve sleep quality and reduce inflammation; physical therapy; psychological and life-style counseling; diet modification; stretching exercises and massage; and, in severe cases, pain management programs. *See* medical encyclopedia entry at MedlinePlus.

[7] Idiopathic is defined as "arising spontaneously or from an obscure or unknown cause." *See* medical dictionary at MedlinePlus.

8

Rochester, Minnesota. Between July 25 and July 29, 1994, she was examined by a number of specialists at Mayo who effectively ruled out Lyme disease, continuing thyroid conditions, and other infectious or major rheumatologic disorders. The lead physician concluded, "I suspect this is all fibromyalgia" (AR 210), while other Mayo doctors opined it was "mostly likely" chronic fatigue syndrome ("CFS.")[8] (AR 211, 202.)

Ms. Lamanna returned to Mayo in November 1994 after she began experiencing daily severe headaches with sensitivities to light and noise and memory problems in addition to her chronic fatigue, muscle aches, joint pain, and sleep disturbances. A neurological consultation and CT scan of her head showed no serious neurological

_____

[8] Chronic fatigue syndrome, also known as immune dysfunction syndrome, is a condition of prolonged and severe fatigue which is not relieved by rest and is not directly caused by other conditions. The exact cause is unknown but viruses such as Epstein-Barr virus or human herpes virus-6 are suspected. It may also be caused by inflammation of pathways in the nervous system which generates a non-specific immune response or process or when a viral illness is complicated by a problem with the body's immune response. To be diagnosed with this condition, the new-onset fatigue must last at least 6 months, not be relieved by bed rest, and be severe enough to restrict the patient's exertion level to 50% or less of her typical exertion levels before the illness. Other medical signs of CFS include mild fever, sore throat, lymph node tenderness, widespread muscle weakness and muscle pain, unrefreshing sleep, headaches, joint pain (often migratory but without swelling or redness), and mental conditions such as forgetfulness, difficulty concentrating, confusion, or irritability. The Centers for Disease Control have identified CFS as a distinct disorder with specific symptoms and physical signs; it is diagnosed by ruling out other possible causes. *See* medical encyclopedia entry at MedlinePlus.

Like fibromyalgia, there is no "dipstick" laboratory test for chronic fatigue syndrome; however, it has been recognized by the Centers for Disease Control since 1988 and the Social Security Administration's internal operations manual lists CFS as a disease to be adjudicated on a case-by-case basis. Sisco v. United States Dep't of Health & Human Servs., 10 F.3d 739, 744 (10th Cir. 1993).

9

condition. Mayo physicians recommended that she continue taking elavil (amitripyline) which had been prescribed for her headaches and which had the added benefit of alleviating her joint pain. (AR 113, 200-201, 536-537.)[9]

Meanwhile, Ms. Lamanna continued working as a special agent although she complained to her physicians that her supervisor at the FBI rejected the idea that she had a medical illness, implying she had "some type of psychosomatic process which is somehow less legitimate than a medical illness or indeed might even be a malingerer who simply doesn't want to work." (AR 181.) She also reported she had been unable to arrange a reduction in her 12- to 15-hour workdays, high-stress assignments, and long commute. In June 1995, Dr. Pappalardo restricted her from any lifting, pushing or pulling, use of defensive tactics, running, and use of firearms. On October 31, 1995, he noted that Ms. Lamanna planned to return to Mayo again, this time to rule out any psychiatric problems associated with CFS and fibromyalgia.

On November 7, 1995, a physician at Mayo described Ms. Lamanna as pleasant, well-groomed, and talkative, with "somewhat of a somatic focus." Noting that she demonstrated no psychiatric illness and had a "positive adjustment" to her illness, he concluded, "I see

---

[9] As shown by this citation, the administrative record in this case is in a state of disorganization such as this Court has seldom experienced. Most disturbing, medical records were unidentified by source and more than 1,200 pages of materials were in no chronological or topical order, excessively duplicative, and, as discussed in more detail below, appear to be incomplete.

10

no [psychological] reasons she cannot perform her job." (AR 174.) The same day, another physician noted that he doubted depression was a major factor. The next day, a Dr. Reeves performed a physical examination and indicated the location of tender points on a chart, commenting that "by history, [she] clearly has fibromyalgia although currently [she] only has 8 tender points." He also reported he had a long discussion with Ms. Lamanna about her diagnosis, the fact that she was dealing with it well emotionally, and that, according to the Mayo psychology team, she had "no psychiatric issues." (AR 175-176.) Dr. Reeves later concluded, "Aside from the stress of her job, this diagnosis does not confirm any inability for her to do her job.... However,... her work environment will not allow her to engage in her fibromyalgia treatment program." (AR 182.)

In a letter to Dr. Pappalardo dated December 11, 1995, Dr. Shon E. Meek, head of the treatment team at Mayo, reported that as a result of the general medical evaluation Ms. Lamanna had just undergone, Mayo physicians had concluded "her symptoms were most consistent with fibromyalgia" and she would benefit from physical therapy, stretching exercises, and biofeedback. Dr. Meek specifically noted that Dr. J.C. Bowar of the Department of Psychiatry had concluded she had no psychiatric disorder or depression and had a positive adjustment to her symptoms; he found "no reason she could not perform her job adequately from a psychiatric standpoint." In sum, the Mayo team concluded "her symptoms of fibromyalgia should not limit her ability to perform her

11

job." (AR 531.)

Despite these reassuring reports, the record indicates that Ms. Lamanna went on unpaid medical leave from the FBI as of February 21, 1996, and applied for LTD benefits. Sometime between February 8 and April 25, 1996, Dr. Pappalardo completed a form referred to as an "Attending Physician's Statement of Disability" in which he indicated Ms. Lamanna had been diagnosed with fibromyalgia and CFS, she was confined to her home, her condition had retrogressed, and she was disabled from her own as well as any other occupation. He further noted that Ms. Lamanna required intensive physiotherapy.[10] (AR 534-535.)

In May 1996, Ms. Lamanna returned to the Mayo Clinic, this time to be evaluated as to her suitability to participate in a pain management program ("PMP.") On May 16, as part of the PMP evaluation, Dr. J.A. Graf noted she was debating whether to resign from the FBI and return to practicing law. He noted a "two-year history of diffuse pain compatible with a diagnosis of fibromyalgia," and further commented:

> She does not present a history of any kind of psychiatric disorder and it is my impression as it was that of Dr. Bowar in 1995 that she is not suffering from any specific psychological disorder. I, myself, do not believe that

---

[10] Defendant suggests that Dr. Pappalardo recommended in this report that Ms. Lamanna was in need of "intensive psychotherapy." (Defendant's Statement of Undisputed Facts, Docket No. 20, ¶ 12, *citing* AR 535.) Although we find Dr. Pappalardo's handwriting somewhat less than completely legible, we conclude he indicated she would require "intensive physiotherapy" based on the fact that the first part of the word is clearly "physio," not "psycho."

fibromyalgia is a psychosomatic process, although like any illness it can be exacerbated by stress.... Excellent candidate for a pain management program.

(AR 181.)

According to the terms of the Plan, long term disability benefits were available to participants who could show they were "totally disabled," a term which had two definitions. During the first twenty-four months of coverage (following a 60-day elimination period), a participant was considered totally disabled if she showed she was "completely unable to perform each and every material duty pertaining to [her] occupation with the employer," a period referred to as the "own occupation period." Thereafter, a participant was considered totally disabled only if she was "completely unable to engage in each and every occupation for which [she] is reasonably qualified by education, training or experience," i.e., the "any occupation period." (AR 1, 7.) As of June 12, 1996, Plan administrators determined that Ms. Lamanna was totally disabled due to "fibromyalgian [sic], chronic fatigue, hypothyroid [sic], immune disfunction [sic] syndrome" under the "own occupation" definition and she began receiving benefits retroactively as of April 20, 1996. (AR 539.)

In the letter granting benefits, SAMBA reminded Ms. Lamanna of several relevant provisions of the Plan, including the requirement that she apply for other sources of income available through the Social Security Administration ("SSA") or the Federal Employees Retirement System ("FERS") and that her LTD benefits paid under the

13

Plan would be reduced by the amount of any benefits she received through such programs. She was also advised that periodic medical updates from her treating physician would be required so SAMBA could "better understand the health problems that preclude the resumption of [her] regular work duties." (AR 1191.)

Ms. Lamanna returned to Mayo in mid-June 1996 for pain management education, an intensive program of physical therapy, occupational therapy, stress management, and behavioral therapy. In an interview conducted on June 17, Ms. Lamanna reported that her primary current stress was related to her job, that is, "her employer has not been supportive of previous/current medical recommendations" that she decrease her workload to an eight-hour day, participate in physical therapy three times a week, and be allowed to relocate to an office closer to her home. (AR 160.) On June 18, she underwent a battery of intelligence, learning, memory, academic achievement, and similar tests. The physician evaluating her noted she seemed anxious while completing the tests but concluded the results were "a valid estimate of the patient's overall level of cognitive functioning." He further reported:

> The patient also completed the Symptom Checklist 90-Revised (SCL-90-R) as part of her psychometric evaluation. Overall, the patient's SCL-90-R symptom profile was not of a nature or magnitude considered to be in the clinical range.... General symptomatic distress levels appeared average, suggesting little global psychological distress. Of most importance, the patient's level of somatization appeared at the normative mean [and] was unremarkable.

(AR 163, 140.)

14

Throughout approximately three weeks of pain management education between June 18 and July 9, 1996, Ms. Lamanna's mood was consistently described as "euthymic" and her affect as "full and responsive." (AR 146-151, 159.) On June 28, 1996, a psychologist noted that her "difficulties with the FBI primarily stem from their nonrecognition of her chronic pain disorder. She states that at the present time the best course of action would appear [to be] to retire on disability and move towards another field of work." (AR 133, 127.) In a dismissal summary dated July 10, 1996, Plaintiff was described as motivated for the PMP,

> alert, oriented, pleasant, cooperative and an excellent historian [with] with no objective signs or symptoms of a formal thought disorder or any cognitive deficits. She appears to be of above average intelligence.... Insight and judgment are excellent.... Her known health problems, fibromyalgia and history of hypothyroidism, are stable.

(AR 152.)

Plaintiff's chief problem was identified as "occupational difficulties resulting from lack of support in the work environment." On discharge, her plan was "to return to her work environment with the hope that they will accommodate her request for a modification in her job responsibilities.... If she is unable to continue working in her current position, she may also pursue vocational counseling and assistance." She was also amenable to seeking "continued supportive therapy from a local psychologist." (AR 152-153.)

Throughout late 1996, 1997, and early 1998, Dr. Pappalardo

15

provided regular attending physician reports in which he indicated Plaintiff was totally disabled from both her own and any other occupation. His last note in the administrative record dates from April 27, 1998, when he remarked:

> Patient returns today with complaints of fatigue, myalgia and recurrent headaches.... Remains tender in deltoid and supraspinatus area. [Fibromyalgia] continues, will require pain relief.... Physiotherapy must continue.

(AR 510.)

On July 29, 1998, some three months after Ms. Lamanna entered the "any occupation period" on April 21, 1998, Peter Dwyer, a Fidelity consultant, wrote to SAMBA, stating:

> We have completed our review of [Ms. Lamanna's] file. It appears that an IME [independent medical examination] could help in the adjudication of the claim file. However, before an IME can be ordered, we will need several things for the file.... [D]etailed medical records should be obtained from all Doctors/Medical Providers mentioned in the file. I noticed a listing in the file of 21 such sources and I noted that at least 17 should be contacted.

(AR 1167.)[11]

The record reveals that on August 6, 1998, SAMBA wrote to at least 12 doctors as well as the Mayo Clinic, requesting Ms.

---

[11] The Court has been unable determine why an "adjudication of the claim file" was initiated since there was no obvious controversy between Plaintiff and Fidelity or SAMBA at this point in time. We assume, therefore, that the word "adjudication" simply refers to a review of Ms. Lamanna's status as she changed from the "own occupation" to the "any occupation" period. On a second point, we have been unable to locate a list identical to that described by Mr. Dwyer. However, AR 97-100 is a list of 21 doctors, 14 of whom have check-marks beside their names. This undated list is written in what appears to be Ms. Lamanna's handwriting, based on the Court's lay comparison to documents known to be written by her.

16

Lamanna's medical records. Dawn Gunnoe, an insurance benefits specialist at SAMBA, replied to Mr. Dwyer's letter on September 18, 1998, enclosing Ms. Lamanna's file and asking him to give his opinion on her claim. She also noted that while SAMBA had requested medical records from all the physicians Ms. Lamanna had seen in the past, some records had not yet been received but would be forwarded to Mr. Dwyer upon receipt.

As a condition to receiving LTD benefits, Ms. Lamanna had entered into a "Promise to Repay" contract in which she agreed to apply for any other disability benefits which might be available to her, including, among others, Social Security disability benefits and disability retirement benefits from her employer. In June 1998, Ms. Lamanna had applied for Social Security benefits as required. The application was denied on September 16, 1998, inasmuch as the SSA had concluded her "joint problem, thyroid disorder and tiredness" were not so severe as to preclude her from working. (AR 750-752.)[12]

In his letter of July 29, 1998, Mr. Dwyer had also suggested that SAMBA get an employer's job description and a supplementary

_____

[12] This is a curious conclusion by the Social Security Administration. Ms. Lamanna's application for benefits identifies chronic fatigue immune dysfunction syndrome, hypothyroidism, and fibromyalgia as the sources of her disability, not the more generic conditions listed by the SAA. (AR 933-936.) Also, the SSA reached its conclusion based on medical reports by a gynecologist, a specialist in allergies and immunology, and two other medical services not listed among Plaintiff's doctors. The statement is made that "no other reports were available" (AR 752), whereas it is clear that Ms. Lamanna had numerous medical reports from Drs. Pappalardo, Welch, and Danehower as well as the physicians at the Mayo Clinic by this time.

17

statement of education, training and experience from Ms. Lamanna. No job description prepared by the FBI seems to be included in the administrative record, but SAMBA received a list of her "activities and responsibilities" prepared by Ms. Lamanna sometime before November 5, 1998 (AR 285), together with the supplementary statement requested. In describing her daily activities in that document, Plaintiff wrote:

I lead a day to day existence in which I try to take care of my basic needs. Bedridden at times for weeks, months, etc. I must depend on others for assistance. The illness for me is cyclical with severe periods of inability, interspersed with my ability to be somewhat ambulatory. There are times I cannot get out of bed or raise my arms to wash my hair. The symptoms wax and wane and new symptoms develop. Uncertainty and unpredictability are the hallmark of my lifestyle. Despite the above symptoms and a host of others too numerous to mention, I maintain a positive outlook and make every effort to be self-sufficient. My focus is on leading a productive life despite my unfortunate medical history.

(AR 284.)

Pursuant to the terms of the Plan, SAMBA or its representative could require a benefits recipient to undergo an independent medical examination on demand. (AR 13, 6.) On January 8, 1999, Dr. Jack J. Berger, a specialist in arthritis and rheumatic diseases and section chief of the department of rheumatology at White Plains Hospital Center in New York, personally examined Plaintiff and reviewed her medical file.

In a letter dated January 11, 1999 (AR 269-271), Dr. Berger first summarized Plaintiff's medical history and her "litany of symptoms." In particular, he commented that although the records

18

from Mayo were "very detailed and comprehensive," they did not "clearly show any definitive evidence that the patient had true trigger point[13] pains that are classic for Fibromyalgia;" even so, she had been diagnosed with this condition and CFS since at least 1996. On physical exam, "palpation of the para-cervical, scapular, lower iliac trigger sites [elicited] a withdrawal response and expression of discomfort," but no significant pain was apparent when he pressed on the trigger points, and there was no "erythema reaction"[14] on the skin at those points. He concluded:

Ms. Lamanna's diagnosis is not readily apparent. She has produced such a list of symptoms, in a manner that makes one believe she has studied all the possible nuances and attributes of Fibromyalgia. However, this is typical of many patients who have been told they have this syndrome – they become very involved in their symptoms and can go into incredibly labored detail about every aspect of their illness. At times one cannot determine when the actual symptoms become more magnified by having repeated their descriptions to so many physicians over many years. Nonetheless, Ms. Lamanna does appear to be incapacitated, if not physically by the sheer range of complaints she presents. For example, her claim that after a bath she has to rest is clearly not a manifestation of Fibromyalgia. It does suggest more of a psychologic problem that needs further evaluation. Her inability to work at the FBI job is apparent, if only by the fact that she cannot manage to go through a day without some issue that she feels is her

[13] The Court notes for the record that none of the physicians involved in this case was particular about the language used to describe the painful points, using the terms "trigger points" and "tender points" indiscriminately. As stated above in note 6, "tender points" is the proper term to use when discussing fibromyalgia.

[14] Erythema is defined as "abnormal redness of the skin due to capillary congestion." *See* medical dictionary at MedlinePlus. In fibromyalgia, tender points are not typically accompanied by signs of inflammation, such as redness, swelling, or heat in the joints and soft tissue. Nor in Plaintiff's alternative diagnosis, CFS, is joint pain accompanied by erythema. *See* note 8, *supra*.

19

Fibromyalgia disorder.    I am not convinced that Ms. Lamanna suffers from Fibromyalgia, but the problem is that she is convinced, or gives that impression, which, as I stated, may be the result of so many physicians attributing her non-specific complaints to this diagnosis. Therefore, I do not recommend that she be returned to her previous occupation, which has a high level of demand, and a high stress level.    She can however, be considered capable, mentally and physically for non-field related tasks, with an eight hour work day.

. . . .

I do not feel Ms. Lamanna ever had true Fibromyalgia, but convincing her [of] that is probably not likely; she may have partial residual [sic] of Lyme disease, but even with more antibiotic treatment, she will probably not report any improvement in symptoms; she is physically fit for any job, but will probably be incapacitated more by the idea that she has a chronic ailment, and effectively, be disabled from that standpoint.    She should have vocational rehabilitation along with psychologic counseling....    Her prognosis for full return to work seems doubtful.

(AR 269-271.)

On March 16, 1999, Ms. Gunnoe wrote to Ms. Lamanna, stating that Dr. Berger's report had been received.    Because it contained a "suggestion of a psychological overlay to [her] condition," Ms. Gunnoe advised Plaintiff that SAMBA was reserving its right to have her submit to a psychological exam in order to clarify whether she was "being paid appropriately according to the provisions of the policy."[15]    Consequently, while SAMBA would continued to pay the

---

[15]    Although not stated in the letter, Ms. Gunnoe's statements regarding the "psychological overlay" and "being paid appropriately according to the provisions of the policy," apparently refer to a provision which, after the initial two years of disability, excludes from coverage "any period of disability or portion thereof, caused by, contributed to, or resulting from a mental, psychoneurotic or personality disorder of the Member [i.e., Plan participant] unless the Member is confined to a Hospital or an institution specializing in the care and treatment of mental, psychoneurotic and personality

20

monthly benefits, it was doing so with a reservation of rights. (AR 1141-1142.)

In approximately April or May 1998, Ms. Lamanna had stopped treating with Dr. Pappalardo and began seeing Dr. Kenneth Croen.[16] In an attending physician's statement dated April 19, 1999, he stated that her "muscle fatigue [and] pain make her unable to work reliably" in her own or any other occupation due chronic fatigue, myalgias, and difficulty concentrating. (AR 503-504.)

On May 4, 1999, the Social Security Administration advised Ms. Lamanna that it was again denying her application for disability benefits, based on its review of the materials previously submitted and Dr. Croen's April 19, 1999 report. The SSA concluded that despite her pain and fatigue, Ms. Lamanna could perform other work even though she could not return to her previous occupation. (AR 741-742.) Ms. Lamanna did not seek further review of this decision by an administrative law judge, the next step in the usual appeals process. (*See* letter of January 18, 2005, from the SSA at AR 739.)

At SAMBA's request, on August 17, 1999, Ms. Lamanna underwent a "semi-structured clinical interview" with Richard P. DeBenedetto, Ph.D. In his report (AR 424-430), Dr. DeBenedetto explained that

disorders." (*See* Plan, Section C(6), at AR 8-9.)

[16] The Court has been unable to pinpoint in the administrative record any medical notes by Dr. Croen prior to the attending physician's statement dated April 19, 1999. The hypothesis that she began treating with Dr. Croen almost a year earlier is based on a statement in the April 19, 1999 report that her first appointment with him was on May 13, 1998. (AR 503.)

21

the purpose of the evaluation was "to establish any causal relationship between the claimant's accident [sic], current psychological status and level of behavioral functioning and to determine the need, if any, for psychological treatment of any causally related psychological symptoms or behavioral dysfunction." (AR 424.) He noted her physical symptoms (essentially as described elsewhere herein) had been "accompanied by increasing psychological dysfunction," e.g., short-term memory impairment, poor attention and cognitive focusing, "major depression and negative change in personality and behavioral functioning," an inability to perform mathematical functions or remember words, slowed mental processing, and confused organizational and "planful" thinking. However, she denied any psychiatric problems or treatment. (AR 424-425.)

Dr. DeBenedetto's clinical findings noted that Ms. Lamanna displayed no overt symptoms of pain, psychological distress or cognitive dysfunction; her speech was normal and she had no difficulty in articulation. He described her behavior as alert, attuned to task and situational demands, and well within acceptable social limits. She related to him in a "somewhat guarded manner, and was "minimally cooperative," but established "a tense but workable rapport." Her thinking was described as logical, coherent and goal directed, although the content "was notable for a focus on her myriad symptoms and perceived disabilities." Her other mental capacities were unremarkable, as were her mood and affect.

Ms. Lamanna denied symptoms of depression, anxiety, stress-

related behavioral dysfunction, sleep disorder or change in personality, stating that her limitations were "due solely to the effects of her physical disabilities" stemming from fibromyalgia. Although she reported short-term memory and attention problems, she stated they did not interfere with her everyday functions, but believed they would likely interfere with her ability to work.

Dr. DeBenedetto administered the MCMI-III psychometric test[17] in order to "identify dominant personality organization and the presence of any significant psychological syndromes or symptom complexes." (AR 427.) He concluded that the test revealed histrionic and narcissistic personality patterns in the "clinically significant range," but no significant elevations in severe personality pathology, clinical syndromes or severe clinical syndromes. Her validity index was elevated in the "desirability scale, suggestive of an avoidant response style"[18] and showed Ms.

---

[17] According to the online encyclopedia, wikipedia.org, "the Millon Clinical Multiaxial Inventory-III (MCMI-III) is a psychological assessment tool intended to provide information on psychopathology, including specific disorders outlined in the DSM-IV.... The test is modeled on four scales: 14 Personality Disorder Scales, 10 Clinical Syndrome Scales, Correction Scales (which help detect inaccurate responding) and 42 Grossman Personality Facet Scales.... The major scales are divided in four ranges: normal (0-60), tendency (61-75), trait (76-85), and personality disorder (86-115)." *See* wikipedia entry for Millon Clinical Multiaxial Inventory, last visited February 21, 2008.

[18] Histrionic and narcissistic are two of the 14 "personality disorder scales" referred to in the previous note. Correction scales include modifying indices (disclosure, desirability and debasement) and a validity index. *See* www.pearsonassessments.com/tests/ mcmi_3.htm, last visited February 21, 2008. Dr. DeBenedetto did not provide numeric data to support his conclusions about Ms. Lamanna, so we are unable to determine where on the scale the "elevated" or

23

Lamanna demonstrated deficits in introspectiveness, would try to present herself "as more psychologically integrated and adjusted than [she] may actually be," and, consequently, might tend "to under report psychological dysfunction." (AR 427.)

A second test, the NPSM,[19] revealed, in Dr. DeBenedetto's opinion, an "extensive list of neurological and cognitive deficits ...highly unusual in the absence of some demonstrable neurological insult," i.e., a "significant brain injury or disease process." He concluded that her "'perceived' cognitive and neurological deficits must remain suspect."[20] (AR 427-428.)

In summary, Dr. DeBenedetto concluded Ms. Lamanna's physical disability had begun "with her perception that she had been mistreated for thyroid disease, moved through a period of perceived mistreatment for Lyme disease, finally resolving itself into a 'presumed' diagnosis of fibromyalgia." He noted, however, that there was "considerable disagreement in the medical record regarding the diagnosis of fibromyalgia as well as questions regarding the psychogenic origin of her reported physical maladies." He further noted a "marked preoccupation" with her illness and symptoms, which in turn raised "a question of somatization and hypochondriasis as

"clinically significant" results may have fallen.

[19] The full name and scope of this test are unknown.

[20] On the NPSM, Ms. Lamanna indicated she had coordination and balance problems, trouble walking, numbness, forgetfulness regarding routine daily activities (e.g., appointments, the time of day, or names of familiar people), difficulty thinking clearly or quickly, concentrating, understanding directions, etc. (AR 428.)

24

well as the suspicion of a possible psychogenic origin to her many physical complaints and related disability." Her psychometric assessment was described as "consistent with a predisposition toward somatic preoccupation and the possible secondary gain which protracted and debilitating illness can confer." He found the history of her illness did not seem consistent with the diagnosis of fibromyalgia which "is known to have a variable course marked by alternating periods of acute exacerbation and relative remission," while Ms. Lamanna showed "chronic, persistent and unremitting illness." (AR 428-429.)

Dr. DeBenedetto concluded there was "a likely underlying psychogenic component" to Ms. Lamanna's illness, but hastened to add that it was "highly likely that she is quite unaware of the intrapychic [sic] dynamics that give rise to her perception of physical debility and illness." He concluded further that she could not return to any of her former jobs as an FBI agent, prosecutor or litigator, and it was unlikely she would be motivated for any other work, "given her belief that she is physically debilitated by fibromyalgia." Treatment for her condition would typically involve "a number of years of intensive exploratory psychotherapy," but Dr. DeBenedetto opined that Ms. Lamanna was "disinclined to perceive her problems as psychological in origin and [was] opposed to the idea that she may be in need of psychological treatment." (AR 429.) He summarized that given the "questionable diagnosis of fibromyalgia," her "fixed idea" of a physical illness would present significant

resistance to psychotherapy, and she would certainly resist a trial of anti-depressant medication "for what may likely be an underlying or masked depression." (AR 430.)

Dr. DeBenedetto's report had no immediate effect on SAMBA's decision-making process regarding continuation of Plaintiff's LTD benefits during the any occupation period. On September 14, 1999, Mr. Dwyer advised Ms. Gunnoe that he was "unable to look over the IME at the present time" because "there were some state audits going on." (AR 1120.) For a few months thereafter, Ms. Gunnoe wrote to Ms. Lamanna regularly, stating that while SAMBA was reviewing her file, her benefits would continue in order to avoid any hardship to her. (AR 1117, 557, 259.) In November 1999, Mr. Dwyer wrote to SAMBA stating that he had met with Fidelity's attorney about this case and that Fidelity was "in the process of obtaining updated medical. [Sic.] Once this is received, we will consider possible [vocational rehabilitation.]" (AR 423.)

Apparently, getting "updated medical" took more than two years. With the exception of a single attending physician's report from Dr. Croen dated July 6, 2000, the next medical notes in the file date from February 2002. Ms. Lamanna apparently began a course of physical therapy under Dr. Croen's supervision at that time, an inference drawn from numerous therapy notes for the period February 2002 through August 2003. In those notes, there are multiple references to treatment for "myofascial trigger points" in the trapezius, interscapular, scapular, suboccipital, scalene,

paraspinal, gluteal, post-cervical and rhomboid muscles. (*See,* e.g., AR 486-487, 494, 497-500.) During the same time period, Dr. Croen noted on November 9, 2002, that Plaintiff was still complaining of chronic myalgias, trigger points in her back, and poor sleep; in February 2003, he repeated his assessment that she was unable to perform either her own or any other occupation. In office notes dated September 11 and October 1, 2003, Dr. Croen noted increased chronic fatigue immune dysfunction symptoms, nausea, severe back pain, and occasional dizziness.

Ms. Lamanna's attorney suggested that she consult Dr. Susan Levine whose speciality is not apparent from the record.[21] In the initial interview on April 15, 2004, Dr. Levine noted Plaintiff's chief complaints were fatigue, malaise, and muscle pain; she ordered a number of laboratory tests plus MRIs of the brain, cervical and lumbosacral spine and a tilt table test to rule out orthostatic intolerance.[22] In a follow up visit on May 4, 2004, Dr. Levine noted that the blood tests and SPECT scan[23] were consistent with CFS and fibromyalgia; she also identified 16 out of 18 trigger points and

---

[21] According to Defendant, Dr. Levine is an allergist and immunologist. (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 19, at 10.)

[22] In her notes from the initial interview, Dr. Levine also referred to letters from Dr. Pappalardo which purportedly attested to Plaintiff's lack of mental problems and malingering. (AR 865.) Such letters do not appear in the administrative record.

[23] The first page of the doctor's notes from May 4, 2004, does not appear to be included in the record, nor has the Court been able to locate the results of the MRIs or SPECT (single photon emission computed tomography) scan.

27

noted that Plaintiff had difficulty counting backwards by serial sevens, indicative of concentration lapses. She concluded Ms. Lamanna's chronic fatigue syndrome remained "completely disabling" and that she was "incapable of gainful employment." (AR 444, 447.) She recommended that Plaintiff follow up with Dr. Benjamin H. Natelson, a neurologist, and a Dr. Langdon, a neuropsychologist.[24]

Plaintiff consulted with Dr. Natelson at the New Jersey Medical School's Chronic Fatigue Syndrome and Fibromyalgia Center on July 20, 2004. Ms. Lamanna reported to him that she was experiencing

> severe problems with fatigue, abdominal pain and problems with sleep.... [H]er activity levels are only 30 percent of what they had been prior to her illness onset and ... she is essentially housebound. She reports the following symptoms at substantial, severe, or very severe intensity: headache, myalgia, arthralgia, unrefreshing sleep, and the complaint that even minimal exertion produces a dramatic worsening of her entire symptom complex. She reports having moderate problems with attention and concentration. This symptom complex is consistent with her fulfilling the 1994 case definition for chronic fatigue syndrome. In addition, review of systems is positive for her having irritable bowel syndrome.
>
> She reports 4 quadrant pain and on physical examination has 17 of 18 tender points. This is consistent with her fulfilling the case definition for fibromyalgia. On a paper and pencil test for depression, Ms. La Manna [sic] showed no evidence of depression.

(AR 438.)

Dr. Natelson concluded that due to these conditions,

> simply requiring her to report to the workplace would be sufficient to produce symptom worsening that would require her to leave immediately in order to rest. Because of

---

[24] If Ms. Lamanna followed up with Dr. Langdon, his records do not appear in the administrative record.

this, I believe Ms. [Lamanna] is 100 percent disabled from her multiple medical diagnoses. I find no evidence of mental illness in this patient.

(AR 439.)

Dr. Croen provided another attending physician's statement on October 20, 2004, noting it was consistent with the reports of October 28, 1998, July 15, 2000, and February 2, 2003, in that Ms. Lamanna's condition was essentially unchanged, she remained disabled from any occupation including her own, and she was not mentally ill. (AR 435-436.)

On November 11, 2004, Emily Stieler, manager of the group plans department at SAMBA, wrote to JHA, Inc. ("JHA"), an external service apparently hired to identify independent medical examiners and arrange appointments for Plan participants. She forwarded Ms. Lamanna's file in preparation for another independent medical examination, a review by JHA staff, and a transferable skills analysis. Ms. Stieler asked that Dr. Berger re-evaluate Ms. Lamanna, but if that were not possible, another board certified rheumatologist would suffice.

Dr. James L. Cosgrove, a physical medicine and rehabilitation specialist (not a rheumatologist), examined Ms. Lamanna in January 2005 and performed a document review. In a letter to SAMBA dated January 21, 2005, his summary of Plaintiff's illness from 1992 through 2004 was essentially consistent with the history of this

case as the Court has described above.[25] He considered his physical examination largely unremarkable, revealing generalized tenderness and discomfort through the cervical paraspinal muscles, upper trapezius, and shoulder girdle, but "no distinct tender/trigger points." (AR 403.) While she complained of mild discomfort in the thoracic and lumbar spine and in her lower extremities, Plaintiff demonstrated good flexion, extension, and rotation without any distinct tender/trigger points. Dr. Cosgrove concluded:

....Ms. Lamanna does not meet the criteria for fibromyalgia.... She has chronic subjective symptomatology without any objective signs of impairment identified in any of the records that I have reviewed. Based upon my review of the medical records and recent history and physical examination, I would not restrict her in her routine daily activities either at work or at home. Consistent with the comments of Dr. DeBenedetta [sic], I would agree that there appears to be a distinct fixed ideology of illness and infirmity. Indeed, any disability to the extent it exists would be considered iatrogenic[26] or existential in nature. It is my opinion, offered within a reasonable degree of medical certainty, that no harm or injury would occur if Ms. Lamanna returned to regular work and home activities. For completeness, I would appreciate the opportunity to review any diagnostic studies (i.e., MRI or x-ray). If there is any change in my opinions noted above, I will issue an addendum.

(AR 404, emphasis in original.)

On February 10, 2005, Ms. Stieler wrote to Ms. Lamanna,

---

[25] One inconsistency is that Dr. Cosgrove indicated Dr. Natelson had seen Ms. Lamanna both on July 20 and August 17, 2004. (AR 401.) While Dr. Natelson's opinion letter is dated August 17, 2004, the Court has been unable to identify any medical records from that date. Thus, it is unclear if the administrative record is incomplete or if Dr. Cosgrove was merely mistaken about this point.

[26] Iatrogenic is defined as "induced inadvertently by a physician or surgeon or by medical treatment or diagnostic procedures." *See* dictionary entry at MedlinePlus.

advising her that as of January 30, 2005, her LTD benefits had been terminated in light of the conclusions of the three independent medical examiners that while she might not be able to return to work as an FBI special agent, she was capable of gainful employment such as the practice of law or in related consulting fields.   She also advised Ms. Lamanna that this decision was subject to a "full and fair review" under ERISA and that as part of that review, Plaintiff had the right to submit issues and comments in writing within 180 days after she received the letter. (AR 733-735.)

Ms. Lamanna appealed SAMBA's decision in a letter dated July 15, 2005, arguing (1) SAMBA had ignored the objective physical evidence of her illness compiled over 13 years; (2) the doctors who performed the IMEs were unqualified for a variety of reasons; and (3) in clear disregard of the medical record, SAMBA attempted to characterize her illnesses as psychiatric disorders. (AR 705-708.) In response, SAMBA contacted JHA again, asking that a medical consultation be scheduled with "a medical doctor who is qualified to address the Mental and Nervous Impairments as well as the Physical Impairments of [Ms. Lamanna]." The letter also asked that the chosen doctor consult as necessary with Dr. Cosgrove or any of the other medical doctors about their conclusions.    (AR 701.)

In an undated e-mail from Evelyn Screen, a long term disability examiner with SAMBA, to JHA, Ms. Screen indicated SAMBA was ready to proceed with the IME by either an occupational therapist or a rehabilitation specialist. However, numerous medical records from

2002 were missing from Plaintiff's file; Ms. Screen inquired if they should wait for these records. An undated telephone message in response indicated that "JHA is in agreement that waiting for the 2002 records will not impact the overall review." (AR 766-767.)

By August 18, 2005, Dr. Dianna Neal had been selected to perform the IME,[27] and advised (incorrectly) that Ms. Lamanna's diagnoses were depression, CFS and irritable bowel syndrome. (AR 695.) On August 31, 2005, Dr. Neal provided her written report, first noting without explanation that it was "not feasible to personally evaluate" Ms. Lamanna and, consequently, her comments were based strictly on the medical notes available to her. After summarizing the medical records she had reviewed,[28] she confirmed Dr. Cosgrove's opinion that Ms. Lamanna could perform other work suitable to her education and training. Dr. Neal concluded:

[i]t is my opinion that the information present does not support the diagnosis of CFS or Fibromyalgia as the cause of [Ms. Lamanna's] multiple symptoms. Both the absence of medical records in addition to limited objective data, by her attending physicians, including documentation of physical exam findings on most visits, makes it impossible to support the diagnoses. Further, there is consensus among Drs. Berger and Cosgrove who performed IMEs, as well as Dr. DeBenedetto ... all of which appear thorough to include complete objective data [sic], which doubt the diagnosis of Fibromyalgia and CFS and suspect

---

[27] There is no evidence Dr. Neal was qualified to address Ms. Lamanna's "mental and nervous impairments" nor was she an occupational therapist or rehabilitation specialist. *See* her curriculum vitae at AR 638-642, indicating her area of specialization was family medicine.

[28] Although Dr. Neal's report is quite detailed, the Court has given little weight to her opinion in light of the fact that it was issued after the February 10, 2005 termination letter and there is no evidence of how her report was subsequently used by SAMBA.

32

psychological etiology. With this said, it is my opinion that [Plaintiff's] multiple symptoms, many of which are likely related to psychological disease[,] limit her ability to perform the duties of her previously physically and mentally demanding occupation. However, it is my opinion, that [Ms. Lamanna] is capable of working in at least a sedentary to light capacity, as her reported activities would at least be described at that level of function.

(AR 46-47.)

On September 6, 2005, Ms. Screen wrote a note to the file, indicating, without further elaboration, that she was "in agreement with Dr. Neal's conclusion that [Ms. Lamanna] should be capable of functioning within at least a sedentary to light capacity." She further noted that although Dr. Neal had questioned the absence of the records from 1992 through 1994 which presumably could have included reference to the criteria used to establish the diagnoses of CFS and fibromyalgia, she believed that even if Ms. Lamanna furnished those records, "it would not change the fact that she exhibits a level of function within at least the sedentary to light classification at this time." (AR 422.) On September 30, 2005, the executive director of SAMBA, Walter E. Sullivan, issued a final denial letter, affirming the earlier termination of benefits.[29]

## V.   REVIEW OF BENEFIT DECISIONS COVERED BY ERISA

ERISA permits a participant or beneficiary of an insurance plan covered by ERISA to bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the

---

[29]   This letter does not appear in the administrative record nor is it provided by either of the parties.

terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In those cases where a court is called upon to determine if the administrator of a benefits plan covered by ERISA has properly interpreted and applied the provisions of the plan, the first matter to be considered is the appropriate degree of scrutiny the court should apply to the administrator's decisions.

As the United States Court of Appeals for the Third Circuit pointed out in Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997), ERISA itself does not establish the standard of review for an action brought under § 1132(a)(1)(B). In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If, however, the plan does provide the administrator with discretionary authority, the standard of review is more deferential. Firestone, id. at 111. This deference applies not only to decisions concerning interpretation of the plan itself, but also to the administrator's fact-based determinations. Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1187 (3d Cir. 1991); *see also* Mitchell, 113 F.3d at 438 (where fact based determinations concerned the administration, interpretation, and application of an LTD plan and the administrator's decisions on those questions were to be

34

"final and binding," the plan clearly provided that such determinations were to be afforded deference.)

While some circuits refer to an "abuse of discretion" standard, the Third Circuit has adopted the phrase "arbitrary and capricious" to describe this standard of review. Ordinarily, under such a deferential standard, this Court may not substitute its own judgment for that of the administrator and may overturn a plan administrator's decision "only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Abnathya v. Hoffman LaRoche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted); <u>Mitchell</u>, 113 F.3d at 439. In short, "when the arbitrary and capricious standard applies, the decisionmaker's determination to deny benefits must be upheld unless it was clear error or not rational." <u>Gillis v. Hoechst Celanese Corp.</u>, 4 F.3d 1137, 1141 (3d Cir. 1993) (internal quotation omitted.)

However, in <u>Pinto v. Reliance Std. Life Ins. Co.</u>, 214 F.3d 377(3d Cir. 2000), the Court of Appeals clarified that the scrutiny a reviewing court gives to the plan administrator's decisions is to be modified according to a "sliding scale" if the court discerns conflicts of interest which may have tainted the decision-making process. That is, the greater the degree of discernable conflict in the decision-making process, the greater the level of scrutiny the court should apply. <u>Id.</u> at 379. This sliding scale approach assists a reviewing court in making "a common-sense decision based on the evidence whether the administrator appropriately exercised

its discretion." Post, 501 F.3d at 162. In determining where on the arbitrary and capricious scale to situate its review, the district court is directed to "examine each case on its facts." Pinto, id. at 392.

More recently, the Court of Appeals emphasized that the sliding scale approach requires consideration of both structural and procedural factors. "The structural inquiry focuses on financial incentives to deny claims while the procedural inquiry focuses on how the administrator treated the particular claimant." Tylwalk v. Prudential Ins. Co., No. 06-4525, 2007 U.S. App. LEXIS 28718, *8 (3d Cir. Dec. 11, 2007), citing Pinto, 214 F.3d at 392-393. We turn first to the analysis of the structural factors.

A.   Structural Factors

Structural anomalies arise primarily from conflicts of interest in the administration, interpretation, and funding of the benefits plan. Where the administrator "has a non-trivial financial incentive to act against the interests of the beneficiaries," this conflict alone is sufficient to heighten the court's review. Post, 501 F.3d at 162, citing Pinto, 214 F.3d at 389-390. The Pinto Court identified three common relationships between the employer and the party making benefit decisions:

1.   the employer funds the plan and pays an independent third party to interpret it and make benefits determinations;

2.   the employer establishes the plan, ensures its liquidity, and creates an internal benefits committee charged with interpreting and administering the plan; or

36

3. the employer pays an independent insurance company to fund, interpret and administer the plan.

Pinto, id. at 383.

Although the first two arrangements typically do not create a conflict of interest, the third "generally presents a conflict and thus invites a heightened standard of review." Pinto, id. The reasoning behind this conclusion is that the independent insurance company has a strong financial incentive to deny claims because its profit consists largely of the difference between the amount paid by the employer for its services less the amounts paid out in benefits. Another arrangement that raises particular concern is a plan funded on a case-by-case basis out of the administrator's operating budget rather than from segregated monies that the employer sets aside specifically to pay benefits. Post, 501 F.3d at 163, *citing* Skretvedt v. E.I. DuPont & De Nemours Co., 268 F.3d 167, 174 (3d Cir. 2001). By comparison, where the employer both funds and administers the plan, but pays benefits from a segregated trust fund, no structural conflict is created. Post, id. at 164, n.6, *citing* Vitale v. Latrobe Area Hospital, 420 F.3d 278, 282 (3d Cir. 2005), and Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 217-218 (3d Cir. 2001).

Here, the parties do not dispute the fact that the Plan now in effect provides SAMBA with the "right to exercise, in a uniform and nondiscriminatory manner, discretion in the Plan's operation and administration." (*See* SAMBA Restated Bylaws and Plan Instrument, as

37

Restated January 30, 2007, ¶ 11.03, PLN 9.) Moreover, SAMBA has the right to determine eligibility for participation, coverage, and receipt of benefits and to determine whether "objective criteria specifically stated in the Plan have been satisfied for any Plan term, condition, limit or waiver." (Id.) Therefore, given the extent of discretion provided to SAMBA, this Court should apply a normal arbitrary and capricious standard of review, considering only if the decision to terminate Ms. Lamanna's LTD benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law." See Abnathya, *supra*.

SAMBA argues that only a straight arbitrary and capricious review should apply because it is organized as a tax-exempt, not-for-profit corporation which has created a grantor trust from which it pays benefits to members, premiums for insurance for such benefits where applicable, and reasonable administrative expenses related to the Plan. (Defendant's Statement of Undisputed Facts, Docket No. 20, "Def.'s Facts," ¶¶ 2-3.) The trust is funded with member contributions. (Id., ¶ 4.) Thus, there is no financial conflict on SAMBA's part which would give rise to heightened scrutiny. (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 19, at 14-15.)

Plaintiff, conversely, argues that "similar to the plan administrator in Pinto, SAMBA is an outside insurer that makes claims decisions itself," the type of structure the Pinto court determined gives rise to heightened scrutiny. (Plaintiff's Brief in

38

Support of Motion for Summary Judgment, Docket No. 22, "Plf.'s Brief," at 7.) She further contends it would be in SAMBA's best interest to deny her claim for benefits because payment of those benefits "would be directly reflected in SAMBA's economic bottom-line." (Id. at 8.)

In reality, it appears the SAMBA situation is somewhat different from any of those identified in Pinto or by the parties herein. That is, the FBI, Plaintiff's former employer, is not the plan sponsor, administrator or funding source. There is no evidence to refute SAMBA's contention that it is a not-for-profit corporation whose sole purpose is to offer a wide range of benefit programs to active and certain retired employees of various federal law enforcement agencies, including the FBI, a status other courts have repeatedly recognized. See, e.g., Myers v. United States, 767 F.2d 1072, 1073 (4th Cir. 1985); Finley v. Special Agents Mut. Benefit Ass'n, 957 F.2d 617, 618 (8th Cir. 1992); Fox v. Special Agents Mut. Benefit Ass'n, CA No. 05-755, 2006 U.S. Dist. LEXIS 74487, *3 (S.D. Ind. Sept. 19, 2006). In the case of long-term disability coverage, benefits for participants are paid from monies contributed by the voluntary participants to the SAMBA trust fund. Therefore, denying a claim for benefits serves the interests of the other plan participants by safeguarding the reserves but does not result in a profit to SAMBA. (Def.'s Facts, Exhibit A, Declaration of Walter E. Wilson, Executive Director of SAMBA, "Wilson Decl.," ¶¶ 4-8.)

However, we question whether the SAMBA structure now in effect

39

was the same as when Ms. Lamanna was originally awarded LTD benefits in April 1996 and when they were terminated in February 2005. Prior to September 1, 2005, SAMBA was not the claims fiduciary, but rather took on that role from Fidelity only as a result of a reserve and liability transfer as of that date. (Def.'s Facts, ¶ 46; *see also* AR 647.) Plaintiff's claim was "under SAMBA's L-1 disability policy ... issued and underwritten by Fidelity Security Life Insurance Company" (AR 648) and the LTD benefits she "originally received were paid through an insurance policy SAMBA purchased from Fidelity Security Life Insurance Company." (Wilson Decl., ¶4.)

Furthermore, the September 1, 2005 notice states:

This Statement of Coverage page is being issued to confirm that effective September 1, 2005, SAMBA *has assumed* liability for claims that had been incurred under the FSL LD-1 policy and *has become* the claims fiduciary for purposes of that coverage. SAMBA *is vested* with all legal discretion to interpret the plan and make eligibility and benefit determinations.

(AR 665, emphasis added.) Had SAMBA previously been liable for claims under the Fidelity policy, had acted as the claims fiduciary, and had been vested with discretion to interpret the Plan, this language would not have been necessary.

The conclusion that benefits were paid by Fidelity is further supported by the Promise to Repay agreement which Ms. Lamanna signed on May 2, 1996, as a condition for receiving LTD benefits. In that agreement, the following statements are made:

- SAMBA members are covered under a group policy issued by Fidelity;

40